HAWKINS, Chief Justice,
for the Court:
In order to properly issue school bonds in Mississippi, a school district must comply with many state and federal laws. As we agree with the Chancery Court that the school district here did so comply, the holding of the Chancery Court validating the bonds is affirmed.

FACTS

In May of 1991, the Board of Trustees of the North Panola Consolidated School District (NPCSD) • passed a resolution which called for a special election concerning the issuance of $4,000,000 in school bonds. On July 9, 1991, this first school bond election was held with the proposed bond being defeated with a margin of 56.67 percent for and 41.72 percent against.[1]
At a July 31, 1991, special meeting the board proposed a second school bond election. There is no record of notice of the meeting in the minutes or in the record. Nevertheless, James W. Harris, Superintendent of the NPCSD in 1991 testified at the August 24, 1993, hearing, “I feel sure notices were posted because that’s the practice that we do for all meetings.”
The minutes of the meeting state that “numerous members of the public were also present.” Furthermore, James Minor, attorney for the NPCSD, testified at the 1993 hearing,
There were a number of people there. I’m really not from Panola County, so sometimes I see faces and don’t know them. But we have a very, very small meeting room and I’m usually there, but that meeting room was filled and there were people outside. But as to the number, I didn’t go outside; but the meeting room itself was filled, yes, sir.
There are also conflicting reports as to which members of the board were at that meeting. The transcript of the minutes sent to the State Bond Attorney lists only four of the five members as present: the president of the board, Robert Haynes; the president pro-tempore, Stella Mamón; the chairman of finance, Polly Gordon; and the secretary, Charles Blakely. Missing from this list is parliamentarian Otis Wallace although this same transcript later lists him as voting at the meeting. Furthermore, the minutes from which the transcript was prepared state that all five board members, including Wallace, were present. Both accounts list Harris and Minor as being in attendance.
Adding more fuel to the fire of controversy is the fact that although the meeting took place on July 31, 1991, the minutes were not signed by board president Haynes until Oeto- *1109 ber 11, 1991, even though they were timely attested by Blakely. Minutes of this meeting and of several other meetings were approved unanimously at a special board meeting held August 21, 1991.
At the July 31 meeting, a resolution was approved by a vote of three-to-two to have a second election September 17 for a $4,000,-000 school bond issue, which was also the date of the Democratic and Republican primaries. Voting for this resolution were Ma-món, Blakely, and Wallace, while voting against it were Haynes and Gordon. A final draft of the resolution was not in front of the board at the time it was passed; a final draft was, however, filed with the Panola County Clerk on August 8, 1991.
The following colloquy concerning the absence of a final draft took place at the hearing between Randall Wall, the attorney who represented the NPCSD in connection with the bond issuance, and Guy Gillespie, the attorney who represented the NPCSD in the case at bar:
,Q. (Mr. Gillespie) Just a couple of questions, please. Mr. Wall, do you feel confident that prior to July 31 of 1991, Mr. Minor, the attorney for the school board, had in his possession a copy that was virtually identical, a copy of a resolution and in proposed form either identical or virtually identical to the form in which it appears in the transcript since sent to the State’s bond attorney?
A. (Mr. Wall) Yes.
Q. All right, sir. If there were anything left out or changes made, would those have been anything other than minor changes reflecting the date or the person who made the motion to adopt the resolution?
A. They would have been in substantially that form.
[[Image here]]
Q. All right, sir. Do you feel certain that prior to that time you had sent him a version of the resolution that was substantially identical to the one that you sent him back in August the 2nd with all the blanks filled in?
A. I’m not certain that I sent them, but I’m certain that he had one in his possession.
Furthermore, although a copy of the actual resolution considered at the July 31 meeting is not in the record, the resolution filed on August 8 is virtually identical to the resolution passed to call the first bond election.
Notice of the second election was published in the August 22 and 29, and September 5 and 12 editions of The Southern Reporter, a weekly newspaper of Panola County. The notice listed the following voting sites:
Precinct Voting Place
East Sardis Sardis City Hall
East Como Water Tower Building
Pleasant Mount Holden Store
West Sardis County Courthouse (Sai’dis)
West Como Como City Hall
South Sardis Sardis Library
Belmont-Hebron Radio Station in Industrial Park
Pleasant Grove Jennings Store
Crenshaw City Hall, Crenshaw
Longtown O’Neal Store
Fern Hill Raymond Speers Home
According to Robert Carter, Circuit Clerk of Panola County during the September 17 election, the West Como school bond election was held at one site, while the West Como primary election was held at two sites. Carter explained:
It was a policy the whole time I was clerk that if the ballot was heavy enough and we expected a heavy turnout, then we split that box.
You have to understand that the majority of the voters in those precincts up there are ones that have great difficulty reading ballots and making decisions in a hurry in the polling place. You have to give them plenty of time. And if we expected a big turnout, we knew it was going to take a lot of time in the booth for each individual voter, then we would split those boxes to make it move faster and a little smoother. We did this in all the boxes where we anticipated problems like that like that, [sic]
The bond issue we didn’t expect that kind of problem because most people knew what they were going to do when they walked in there. It was either yes or no. And most of them knew what they were going to do and it shouldn’t take but seconds to mark the ballot. And we didn’t *1110 figure they were going to have lines backed up and that sort of thing, and so we didn’t split it.
In West Como, the entire bond issue vote was held in the City Hall police station,[2] while the primary election was split, with A-to-K in the City Hall police station and L-to-Z in the nearby fire station.
Betty Matthews, a taxpayer/objector in this suit, who worked at the Republican table at the fire station, was cross-examined by Gillespie at the hearing about past election procedures:
Q. You said that prior to this election that you worked in September of 1991—
A. Yes, sir.
Q. —that was the first time you — the first time they had gotten it switched over to where you could vote in the police station and the fire station for the primaries?
A. That’s the first time that I had worked in it.
Q. Right. Okay. And on previous occasions the regular' voting place for that precinct had been the City Hall, as I understand it?
A. Yes, sir.
Q. And the City Hall is right adjacent to the fire station and the police station?
A. Yes, sir. The police station is where the boxes are when they work in the City Hall.
Q. Okay. So let me make sure I understand it. In times past, the proper voting place for that precinct had always been City Hall?
A. Yes, sir.
Q. But a recent change allowed the primaries in ’91 to be held in different places than where they had been before? A. Well, they allowed us to go into the fire station.
Q. Okay.
A. I don’t know the reasoning unless it was maybe because both of us was going to be set up in there. I don’t know.
Q. All right.
A. I don’t know the reason.
Q. But how many years did you say?
A. What?
Q. How long have you lived in this county?
A. I’ve lived in this county 53 years. That’s how old I am. That’s where I’ve lived all my life.
Q. I wasn’t going to ask you that.
A. I’ve lived in the Como area for 30 years. I’m originally from Batesville.
Q. All right. And so in that 30 years this is the first time you remember the primary elections being held in the fire station and the police station as opposed to City Hall? Do I understand you correctly?
A. Yes sir. That’s the first time I remember.
Q. So if someone preparing for an election in 1991, in September of ’91 had told someone that their elections were going to be held at the usual place that they’ve always been held for west Como, that would have been the City Hall?
A. Yes, sir.
Carter gave testimony while being questioned by Gillespie which echoed that of Matthews:
Q. Mr. Carter, as I understand it, what you’ve told us is that elections had always in the past been at the Como City Hall for the West Como precinct?
A. That’s where the designated precinct is and that’s what the name of the precinct that was put on all the papers.
Other witnesses claimed that the fire station was their usual voting place. Taxpayer/objector Melba Shipman stated at the hearing that although she remembered voting at the City Hall once, she voted “most of the time at the fire station.” Furthermore, Melba Shipman’s husband, taxpayer/objector Paul Shipman, stated that in the 10 years that he had lived in Panola County, he had voted at the fire station 90 percent of the *1111 time and at the City Hall only 10 percent of the time.
Joyce Jackson, a taxpayer/objector who was a poll watcher for one of the candidates that day, gave testimony at the hearing which helped set the election day scene. She was first questioned by John Dulaney, counsel for the taxpayer/objectors:
Q. All right. Now, what type of election was being conducted in the fire station?
A. It was for the candidates there. The bond issue was being voted in the City Hah.
Q. All right. Was there any evidence of any bond issue election in the fire station?
A. No, sir, not in the fire station.
Q. Were there any signs there, Ms. Jackson, telling voters to go to the City Hall to vote in the election?
A. I saw no signs.
Q. Do you recall anybody being present directing people to go to City Hall to vote in the bond election?
A. No, sir, no one particularly was there to direct anyone if anyone asked.
Jackson was then cross-examined by Gillespie:
Q. ... It.was no secret that there was an election going on down at City Hall, was there?
A. I had been told that there was an election going on down at City Hall.
Q. And it wasn’t conducted in some dark room in the back where nobody could find them, was there?
A. I don’t know about that, sir. I just knew where it was.
Q. You had no problem finding the ballot boxes in City Hall?
A. I was told where it was, yes, sir.
Q. And they were out there where anybody could see them if they walked in City Hall?
A. Yes, sir.
The splitting of the election in this manner seemed to confuse at least some of the Pano-la County voters. Paul Shipman testified at the hearing while being examined by Dula-ney:
About 9:30 that morning I reminded my wife before I left home to be sure and go vote today. I drove to Como and I saw the fire station was open, the doors were up, which was telling me that that was my place to vote. However, there was no parking places. I’ve never seen so many people. But I just drove until I came to a parking place, which happened to be just north of the police station, before I could find a legitimate parking place. Well, instead of walking, knowing I had voted in some elections at the police station, I went in to the police station. It was not crowded with voters, but it was very crowded with people. It was just a sea of people in there. And I got behind a very short line. One person. And I said, “I came to vote.” I could see no signs for the people. There may have been signs, but they were not obvious.
She said, “What is your name?” This is one of the election officials.
I said, “Shipman.”
She -said, “You go to the fire station. You don’t vote here.” I was sent away. Paul Shipman further testified that he could not tell if there was anything else at the City Hall which would show that there was another election taking place and that once he arrived at the fire station, there was nothing there to indicate that there was a bond election being conducted at the City Hall. It is also unclear how aware Paul Shipman was of the bond election. On direct examination by Dulaney, he testified that the first time he realized that there was a bond election was when his carpenter told him about it around 7:00 on the night of the election; on cross-examination by Gillespie, however, he testified that he did know about the bond vote before the election but that “it was not a priority item on the election for me.”
The Report of Election Commissioners of Panola County stated the final count for this election as 2,407 votes for the bond issue, 1,592 votes against the bond issue, 27 under votes or ballots turned in without being voted, and 17 over votes or ballots turned in with both choices voted. This same report *1112 listed the total ballots cast as 4,052 and gave the percentages as 59.55 percent for, 39.35 percent against, .66% under, and .42% over.[3]
We note that the numbers given by the Election Commissioners are incorrect. The total number of ballots clearly marked for or against the bond issue is 3,999 and the total number of other ballots cast is 44, making a grand total of 4,043, not 4,052 ballots. The total vote discrepancy was noted by Judge Bearden at the hearing and is not otherwise explained in the record.
On October 2, 1991, the Tunica law firm of Dulaney & Dulaney sent a letter on behalf of “several citizens and taxpayers” to the NPCSD Board of Trustees which discussed the possibility of a lawsuit if the bond issue was approved. The NPCSD Board of Trustees held a special meeting the next day at which they considered the results of the September 17 election. Members of the public and all five members of the board were present as were Harris, Minor, and Paul Ship-man. A resolution determining that the bond issue received at least 60 percent of the vote in the September 17 election was proposed. It was entitled:
RESOLUTION ACCEPTING THE REPORT OF THE ELECTION COMMISSIONERS WITHIN AND FOR THE NORTH PANOLA CONSOLIDATED SCHOOL DISTRICT, PANOLA COUNTY, MISSISSIPPI, CONCERNING A SPECIAL BOND ELECTION HELD IN SAID COUNTY ON SEPTEMBER 17, 1991, AND ADJUDICATING THAT AT LEAST THREE-FIFTHS OF THE QUALIFIED VOTERS OF SAID DISTRICT WHO VOTED IN FAVOR OF THE ISSUANCE OF GENERAL OBLIGATION BONDS OF THE NORTH PA-NOLA CONSOLIDATED SCHOOL DISTRICT OF PANOLA COUNTY, MISSISSIPPI, IN THE PRINCIPAL AMOUNT OF FOUR MILLION DOLLARS ($4,000,-000).
The resolution failed to receive the required majority with Mamón and Blakely voting to approve this resolution, Haynes and Gordon voting against the resolution, and Wallace abstaining.
On December 9, 1991, a lawsuit styled “Panola County Voters League, Ruth P. Cox, Henry Hamilton, Johnny Mae Milkens, Emma Mae Dukes, and Jessie Mae Ward vs. North Panola Consolidated School District, Charles Blakely, Robert T. Haynes, Polly Gordon, Stella Mamón, and Otis Wallace, Individually and In Their Official Capacities As Members of The Board of Trustees Of The North Panola Consolidated School District” [4] was filed in the Circuit Court of the First Judicial District of Panola County.
The complaint alleged that the board in-., correctly calculated the vote in the September 17 election when they included the 27 under votes and the 17 over votes in the vote total.[5] Omitting these 44 non-votes, leaves 3,999 true votes of which 2,407 votes were for the issue and 1,592 against. Based on a vote total of 3,999 there are 60.2 percent for and 39.8 percent against. Plaintiffs alleged the resolution actually passed and the board should have therefore adopted the resolution. A motion for summary judgement was filed by the Panola County Voters League, et al on December 10, 1991, and on January 24, 1992, an Answer was filed by the NPCSD. On August 28, 1992, the NPCSD filed a Motion for Dismissal saying that the claim of the Voter’s League had become moot. This lawsuit was finally dismissed on February 23, 1993.
*1113 By the summer of 1992, the composition of the NPCSD Board of Trustees had changed. Haynes resigned on June 29, 1992, and by the regular board meeting of July 9, 1992, Wallace was president, Mamón was vice-president, Gordon was secretary, and Blakely was parliamentarian. No one replaced Haynes on the board until January of 1993.
At that July 9, 1992, regular meeting, a resolution was proposed which stated that the $4,000,000 school bond issue received the necessary sixty percent vote in the September 17, 1991, election. However, this same resolution authorized the issuance of only $2,500,000 of those bonds. Paragraph 5 dealt with the how the vote total was to be calculated:
It is hereby found, determined and adjudicated that 2,407 votes were cast for the bond issue, 1,592 votes were cast against the bond issue, and that there was a total of 3,999 valid votes cast and counted in said election either for or against the issuance of the proposed bonds. It is further found and determined that 2,407, those voting for the proposed bonds, is 60.19% of 3,999, the total of those voting in the aforesaid election. Therefore, it is hereby found, determined and adjudicated that at least three-fifths of the qualified voters of the District who voted in said election voted in favor of the issuance of such bonds.
The board used the same vote total as the plaintiff Voters League. This resolution was unanimously approved by the four person board.
Another regular meeting of the board was held on September 10,1992. At this meeting a resolution was proposed which authorized the issuance of the $2,500,000 bond issue and which provided the details for issuance and repayment of this bond. The four-person board voted unanimously to pass this resolution as well. It should be noted that while president Wallace signed this resolution, he did not sign the minutes of the September 10, 1992, meeting.
On that same day, Superintendent Harris certified the Transcript of Proceedings that was sent to the State Bond Attorney. That certification read:
I, James Harris, the duly appointed, qualified and acting Superintendent of the North Panola School District hereby certify that the following persons constitute the duly qualified and acting members of the Board of Trustees of the North Panola School District (the “Board” of the “District”) relating to the issuance of the negotiable interest-bearing General Obligation amount of Two Million Five Hundred Thousand Dollars ($2,500,000), dated October 1, 1992 (the “Bonds”), to wit: Charles Blakely, Polly Gordon, Stella Mamón and Otis Wallace.
I further certify that Otis Wallace was the duly qualified and acting President of the Board at all times relative to the proceedings relating to the issuance of the Bonds.
I further certify that the time set for holding regular meetings of the Board as set by its order is on the second Thursday of each month at 7:00 P.M., unless otherwise specified by the Board.
I hereby certify that the attached and foregoing pages included in this bond transcript constitute a full, true and complete transcript of all of the proceedings of the Board of the District, which relate to and/or affect the issuance and sale of the Bonds.
I further certify that his transcript includes all legal papers pertaining to the issuance of the Bonds, including excerpts of minutes of meetings of the Board, resolutions and proofs of publication, all of which are on file and that all of the minutes for the meetings presented in this transcript have been properly signed as required by law.
I further certify that none of these proceedings or resolutions of the Board in the matter of the issuance and sale of the Bonds have been amended, modified, vacated or rescinded in any matter, except as may be indicated; and that all resolutions contained herein have been submitted to and approved by the President of the District; and that no appeal has been taken from any of the actions of the Board in connection with said matter.
*1114 I further certify that there is no litigation now pending or threatened in any way involving the issuance and sale of the Bonds.
At the time of the transcript’s certification, the December 9, 1991, Voter’s League lawsuit had yet to be dismissed.
On September, 30,1992, State Bond Attorney Webb Franklin issued his opinion, stating in part:
4. The [Transcript of Proceedings] reflect that all of the acts of the aforesaid issuing authority relative to the issuance of the aforesaid obligations were conducted pursuant to lawful resolutions, orders and proceedings, legally adopted and authorized, and were in strict accordance with the Constitution and laws of the State of Mississippi, including §§ 37-59-1 through 37-59-45, Mississippi Code of 1972, as amended.
5. The above described obligations are regular, legal and valid as to form, principal amount, denomination, interest rate, maturities, and otherwise, and the same obligations do not exceed any limitations imposed by law.
6. There is no known litigation pending which would affect the validity of the above described obligations.
I AM, THEREFORE, OF THE OPINION from the transcript provided to me for review, that all necessary legal steps have been taken to make the issuance of said obligations legal, valid, and binding.
On October 21, 1992, a group of taxpayers filed an objection in the case of In Re: Validation of $2,500,000 General Obligation School Bonds, Series 1992, North Panola Consolidated School District, Dated October 1, 1991, in the Chancery Court of the First Judicial District of Panola County entitled “Objections By Taxpayers to Validation of Bonds Etc.”[6] This objection stated that due to irregularities in the meetings and minutes of the NPCSD Board of Trustees, irregularities in the September 17,1991, bond election, inaccuracies in the Transcript of Proceedings given to the State’s Bond Attorney, as well as various other procedural shortcomings, the school bonds should not be validated.
In response, the NPCSD filed an Answer to Objections by Taxpayers to Validation of Bonds, Etc. on January 4, 1993. After the recusal of the original chancellor, the Honorable William Bearden was appointed Special Chancery Judge to hear this matter. A hearing was held on August 24-25, 1993, after which, on December 10, 1993, Judge Bearden issued his opinion. This opinion made many legal findings and concluded that the objections filed by the taxpayer/objectors were insufficient to invalidate the bond election.[7]
The taxpayer/objectors then on December 15, 1993, filed a motion styled Motion of Taxpayer/Objectors to Amend Findings and Make Additional Findings Pursuant to Rules of Civil Procedure. On December 23, 1993, the NPCSD replied with their Response of North Panola Consolidated School District to Objectors’ Motion to Amend Filings.
A Decree of Validation was given by Judge Bearden on December 29, 1993, which concluded that:
IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the final judgment of this Court hereby is entered in accordance with this Court’s Opinion rendered December 3, 1993, incorporated herein by reference for all purposes, and that the above described obligations be, and the same hereby are, approved, confirmed and validated.
On January 11,1994, an Order was handed down by Judge Bearden which denied the taxpayer/objectors’ Motion to Amend and Make Additional Findings. Three days later, the Taxpayer/Objectors appealed to this court.

LAW

Before this court begins its examination of the Chancery Court’s holdings, it should be remembered that a chancellor’s determinations are to be given great deference. It is well established that:
*1115 [T]he findings [of a chancellor] will not be disturbed unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied. See Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309, 1313 (Miss.1989) (citing Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss.1983)); Bullard v. Morris, 547 So.2d 789, 791 (Miss.1989); Johnson v. Hinds County, 524 So.2d 947, 956 (Miss.1988).
And the chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor’s authority by replacing his judgment with its own. See Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987); Hall v. State ex rel. Waller, 247 Miss. 896, 903, 157 So.2d 781, 784 (1963).
Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993).
Furthermore, “with respect to issues of fact where the chancellor made no specific finding, we are required by our prior decisions and by sound institutional considerations to proceed on the assumption that the chancellor resolved all such fact issues in favor of appellee.” Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985).

I. WHETHER IRREGULARITIES IN THE PROCEDURE AND MINUTES OF THE JULY 31, 1991, NPCSD BOARD OF TRUSTEES MEETING RENDER THE BOND ISSUE INVALID.

A. NOTICE OF THE JULY 31, 1991, SPECIAL MEETING WAS MISSING FROM THE SCHOOL BOARD MINUTES.

This point is a question of law concerning the Mississippi Open Meetings Act, Miss.Code Ann. § 25-41-1 to -17. This act requires, among other things, that notice be posted of certain types of meetings held by certain types of governmental organizations and that such notice be entered into that organization’s official records:
Notice of meetings.
(1) Any public body which holds its meetings at such times and places and by such procedures as are specifically prescribed by statute shall continue to do so and no additional notice of such meetings shall be required except that a notice of the place date, hour and subject matter of any recess meeting, adjourned meeting, interim meeting or any called special meeting shall be posted within one (1) hour after such meeting is called in a prominent place available to examination and inspection by the general public in the building in which the public body normally meets. A copy of the notice shall be made a part of the minutes or other permanent official records of the public body.
Miss.Code Ann. § 25-41-13.
The NPCSD Board of Trustees is a public body for the purposes of the Open Meetings Act. See, Miss.Code Ann. § 25-41-3(a). In addition, “meeting” is defined under this act as, “an assemblage of members of a public body at which official acts may be taken upon a matter over which the public body has supervision, control, jurisdiction, or advisory power.” Miss.Code Ann. § 25-41-3(b). The term “official acts” is defined in Board of Trustees et al. v. Mississippi Publishers Carp., 478 So.2d 269 (Miss.1985), to “include actions relating to formation and determination of public policy.” Id., at 278.
An examination of the record reveals that many activities took place at the meetings of the Board of Trustees such as the hiring and firing of school employees and the conducting of student disciplinary actions which would clearly qualify as official acts affecting the supervision of the school district. Certainly the passing of the resolution to hold the second school bond election which took place at the special meeting of July 31,1991, would so qualify. As the Board of Trustees is a § 25-41-3(a) public body, a meeting of the Board is “an assemblage of members of a public body at which official acts may be taken upon a matter over which the public body has supervision, control, jurisdiction or advisory power.” Miss.Code Ann. § 25-41-3(b).
*1116 The Open Meetings Act therefore applies to the meetings of the Board of Trustees and proper notice of its special meetings must be given and entered into the board’s official records.
Notice of the July 31, 1991, board meeting was never entered into any of the school board minutes or in any other permanent official school records as required by § 25-41-13(1) of the Mississippi Open Meetings Act. This violation in and of itself, however, does not make the meeting a nullity.
Section 25-41-15 of this act governs how it is to be enforced and describes the remedies available to the public if the law is not followed:
The chancery courts of this state shall have the authority to enforce the provisions of this chapter upon application of any citizen of the state, and shall have the authority to issue injunctions or writs of mandamus to accomplish that purpose.
Miss.Code Ann. § 25-41-15.
While noncompliance may subject a board to an injunction or writ of mandamus, nowhere is it written that the lack of recorded notice of a special meeting nullifies all the actions taken. There was some controversy at the hearing as to whether the notice had been posted at all. This same rule applies, however, even if it had been conclusively proven that no notice of any kind was given. While it was certainly a violation of the Open Meetings Act, the failure of the school board to record any notice of the special July 31, 1991, meeting did not void the actions of the school board taken at that meeting.

B. THE MINUTES OF THE JULY 31, 1991, SPECIAL MEETING WERE NOT SIGNED BY THE BOARD PRESIDENT UNTIL OCTOBER 11, 1991.

Section 37-6-9 of the Mississippi Code reads:
President and secretary of school board; quorum; minutes; reports; voting or abstaining on questions.
The school board of all school districts shall organize by the election of a president and a secretary from its membership whose duty it shall be to make reports and to perform all other duties required by law. A majority of the members of the school board shall constitute a quorum for the transaction of business. Minutes shall be kept of all meetings of the school board showing (a) the members present and absent; (b) the date, time and place of the meeting; (c) an accurate recording of any final actions taken at such meeting; (d) a record by individual member of any votes taken at such meeting; and (e) any other information that the school board requests to be reflected in the minutes. Each member of the school board present shall either vote or abstain on every question upon which a vote is taken at such meeting. All action taken by a school board shall become official at the time it is taken. All minutes of the school board shall be signed by the president of the board, shall be attested by the secretary of the board and shall be adopted by the board at the next regular meeting, or within thirty (30) working days, whichever occurs later.
Miss.Code Ann. § 37-6-9.
Section 37-6-9 is part of the Mississippi Uniform School Law of 1986, Miss.Code Ann. §§ 37-6-1 to -15. This set of statutes does not state the degree of precision with which they are to be followed or what the consequences are if one fails to fulfill their requirements.
The closest this Court has ever come to addressing these issues is the case of Cheatham v. Smith, 229 Miss. 803, 92 So.2d 203 (1957). This case interpreted a 1953 statute and concerned not the delayed signature of a board president but the complete failure to attest of a board secretary. We held:
In Martin v. Board of Supervisors of Winston County, 1938, 181 Miss. 363, 386, 178 So. 315, 320, it was said that: “In dealing with boards or courts administrated by men unlearned in technical requirements, strict construction of their orders should not be had.”... Strictness of verbiage is not required; all that is necessary is substance, and a fail’, reasonable construction of the order.
92 So.2d at 208.
We then addressed the signature requirement:
*1117 Appellants also argue that, since the minutes of July 18 were not attested by the secretary of the board of education, who is the county superintendent of education, the minutes are invalid. They were signed by the president of the board. The statutory direction that they should be attested by the secretary is directory and not mandatory. Miss.Laws 1953, Ex.Sess., Chapter 16, Section 5. Failure of the executive secretary of the board to attest the minutes is an irregularity but not a fatal defect.

Id.

While hardly four square with the case at bar, dealing with the necessity of a secretary’s and not a president’s signature, and interpreting a long-since superseded statute, Cheatham has relevance. School boards are still governed by people unlearned in technical requirements. Furthermore, although Cheatham was concerned to a large extent with the need for precision in the words of a school board, its reasoning is just as sound in regards to the need for precision in their actions. Strictness of action, like strictness of verbiage, should also not be required.
Section 37-6-9 imposes three requirements for validating the minutes of a school board meeting. First, the president must sign the minutes, second, the secretary must attest the minutes, and third, the school board must adopt the minutes, all at the next regular meeting or within 30 working days, whichever occurs later. In the case at bar, within 30 working days[8]' (which occurred later than'the next regular meeting) the secretary had attested the minutes and the board, including president Haynes, had unanimously approved the minutes. All that was lacking was Haynes’ signature, which was supplied soon thereafter.
To say that this technical shortcoming of the minutes invalidated all of the board’s actions at that meeting, especially when such a result is in no way mandated by the statute, would be overly harsh. While the rules imposed by this statute are certainly not to be ignored, they do not require perfection. Although Haynes’ late signing of the minutes was a violation of the statute, it was not an error such that the actions of the board at the July 31 meeting should be voided.

C. A FINAL VERSION OF THE ELECTION RESOLUTION WAS NOT IN FRONT IF THE BOARD WHEN IT PASSED AND WAS NOT INCLUDED IN THE MEETING MINUTES.

It is undisputed that the final draft of the resolution calling for the September 17, 1991, bond election was not in front of the board when the resolution was approved. However, this does not mean that the school board was operating in total darkness. The board was able to review a draft of the resolution before they voted. In addition, the final draft of the resolution that the board adopted was almost identical to the resolution that they had already approved and entered into the record the preceding May. Indeed, the section of the July 31, 1991, special meeting minutes which commemorates the passing of the school bond election resolution reads, “On motion by Mr. Blakely, seconded by Ms. Mamón, the Board, after discussion, approved a resolution to put the School Bond Issue, previously defeated, before the public a second time on September 17, 1991.” (Emphasis added.) Apparently, the May of 1991 resolution which called for the first bond election was still very much on the minds of the Board of Trustees on July 31, 1991.
Furthermore, there is unrefuted testimony that the practice of adopting unfinished resolutions and later filling in the blanks was not uncommon. Indeed the information that was later inserted here included the names of those who forwarded and seconded the motion and the final vote on the resolution, information which could not have been entered or even known before the meeting.
The appellant taxpayer/objectors also decry the fact that a draft of the resolution was not included in the minutes of the meeting. *1118 However, while it is arguably good practice to so include such resolutions, it is not required by § 37-6-9. All that the statute requires the minutes to show is:
(a) the members present and absent; (b) the date, time and place of the meeting; (c) an accurate recording of any final actions taken at such meeting; (d) a record by individual member of any votes taken at such meeting; and (e) any other information that the school board requests to be reflected in the minutes.
Miss.Code Ann. § 37-6-9.
The minutes of the July 31, 1991, meeting do show the members present and absent, the date, time and place of the meeting, that the action of the vote took place and do record how each board member voted. By doing so, the minutes satisfy all the statutory requirements of § 37-6-9. The fact that the board chose to not include any further information such as a draft of the resolution does not invalidate the minutes and certainly does not nullify the actions of the board which took place at the meeting.
In the case at bar, neither the fact that a final draft of the resolution was not in front of the board when the board approved it, nor the fact that a copy of the resolution was not entered into the record, constitutes error such that the actions of the board at the July 31, 1991, meeting should be invalidated.

II. WHETHER THE BOND ISSUE PASSED.

A. THE CALCULATION OF THE TOTAL VOTE COUNT.

The controversy surrounding the bond election of September 17, 1991, is unusual as it is centered not on the number of votes east for or against an item, but on the number of votes cast. If one counts the 27 under vote ballots and the 17 over vote ballots as part of the total votes cast, the bond issue receives 69.66 percent of the vote. If one disregards these ballots, the bond issue receives 60.2 percent of the vote.
There is no statute which specifically mandates how one is to count over and under voted ballots in a school bond election. However, § 23-16-547 addresses this issue in regards to the election of candidates:
Improper ballot not to be deposited or counted.
If the voter marks more names than there are persons to be elected to an office, or if for any reason it be impossible to determine from the ballot the voter’s choice for any office voted for, his ballot so cast shall not be counted for that office. A ballot not provided in accordance with law shall not be deposited or counted.
Miss.Code Ann. § 23-15-547.
Although this rule is not aimed directly at school bond elections, it is useful in showing how the legislature believes elections should be run in general. Furthermore, the school bond case of Tedder v. Board of Supervisors of Bolivar County, 214 Miss. 717, 59 So.2d 329 (1952), echoes this statute in saying that the test for determining whether a ballot should be counted “is whether it is possible to reasonably determine from the ballot the voter’s choice.” Id., at 334.
When one applies the law to the case at bar, it becomes plain that the 44 ballots which were over or under voted so that the voter’s choice could not be determined should be disregarded. Therefore, the final number of votes cast should be counted as 3,999 and the final percentage of votes for the bond should be counted as a passing 60.2 percent.
B. DETERMINING THE OUTCOME OF THE ELECTION.
In regards to who is to determine whether a three-fifths vote is attained in a school bond election, § 37-59-17 reads:
Certifying results of election; issuance of bonds.
When the results of the election on the question of the issuance of such bonds shall have been canvassed by the election commissioners of such county or municipality, and certified by them to the school board of the school district, it shall be the duty of the school board to determine and adjudicate whether or not three-fifths (3/5) of the qualified electors who voted in such *1119 election voted in favor of the issuance of such bonds....
Miss.Code Ann. § 87-59-17.
The school board exercised this statutory duty and determined in their regular board meeting of July 9, 1992, that three-fifths of the electors voted for the bonds. Assuming that the election and this meeting were otherwise unsullied, this adjudication by the board should be conclusive.

III. WHETHER THERE WERE CHANGES IN THE POLLING PLACES WHICH INVALIDATED THE ELECTION UNDER THE VOTING RIGHTS ACT.

The law in this area is fairly clear. The federal Voting Rights Act of 1965 requires political subdivisions in Mississippi to get pre-election clearance from the United States Attorney General before altering any, “standard, practice, or procedure with respect to voting.” U.S.C.A. § 1973c. The United States Supreme Court case of Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), has interpreted this law saying that:
Even without going beyond the plain words of the statute, we think it clear that the location of polling places constitutes a “standard, practice, or procedure with respect to voting.” The abstract right to vote means little unless the right becomes a reality at the polling place on election day. The accessibility, prominence, facilities, and prior notice of the polling place’s location all have an effect on a person’s ability to exercise his franchise. Given § 5 [of the Voting Rights Act’s] explicit concern with both the purpose and the effect of a voting “standard, practice, or procedure,” the location of polling places comes within the section’s coverage.
Id., at 387, 91 S.Ct. at 436.
Perkins also goes on to say that in regard to some violations of this rule it may be appropriate to disregard the erroneously conducted vote and hold new elections.
No preclearance in regard to potential election site changes was obtained before the September 17, 1991, school bond vote. Therefore, if the location of the voting places was altered, this election was conducted in violation of the federal Voting Rights Act.
Whether there was a change in the location of the voting places is primarily a question of fact. The chancellor in the court below addressed this issue, stating that:
The objectors argue that the polling place in the West Como precinct was not the usual and customary polling place. The notice of the election showed the Como City Hall to be the polling place for the West Como precinct. The chairperson of the election commission and the Panola County Circuit Clerk testified that the Como City Hall was the usual and customary polling place for the West Como precinct.
[[Image here]]
The court has carefully considered all of the written objections filed by the Objectors and does hereby find and hold the said objections are not sufficient 'to invalidate the bond election.
This finding by the Chancellor must be upheld. Taxpayer/objectors Paul and Melba Shipman did both testify that the fire station and not the City Hall was their normal voting place. However, this testimony was not uncontradicted. Betty Matthews, another taxpayer/objector, stated that the normal voting place had always been City Hall as did Panola County Circuit Clerk Robert Carter. The fact that Judge Bearden chose to believe Matthews and Carter instead of the Ship-mans cannot be said to constitute an abuse of discretion or make the chancellor manifestly wrong.

IV. WHETHER THE NPCSD BOARD OF TRUSTEES COULD ACT WITH ONLY FOUR MEMBERS.

According to § 37-6-7, “Each school district shall be governed by a school board consisting of five (5) members, selected in the manner provided by law.” Miss.Code Ann. § 37-6-7. Provisions for the filling of school board vacancies are found in § 37-7-207:
All vacancies which may occur during a term shall be filled by appointment of the consolidated school district trustees, but the person so appointed shall serve only *1120 until the next general election following such appointment, at which time a person shall be elected for the remainder of the unexpired term at the same time and in the same manner as a trustee is elected for the full term then expiring.... Said appointee shall be selected from the qualified electors of the district in which the vacancy occurs.
Miss.Code Ann. § 37-7-207.
Neither the code nor the case law discuss whether or how the power of a shorthanded school board should be curtailed, nor do they provide a time limit in which board vacancies should be filled.
Robert Haynes left the NPCSD Board of Trustees on June 29,1992. When the school board held their next regular meeting ten days later on July 9, 1992, a replacement for Haynes had not been selected. At this meeting, a shorthanded four member board unanimously passed a resolution declaring the that the school bond issue received a three-fifths vote in the September 17, 1991, election and further authorized the issuance of $2,500,000 in school bonds.
The taxpayer/objectors aver that a shorthanded school board must appoint a replacement for any missing member before it may conduct normal business. The effect that such a strict rule would have, however, would be to paralyze a board until a suitable candidate is found, approved, and trained. While this potentially lengthy process was going on, crucial school board business such as the hiring and firing of employees, the approval of school expenditures and student disciplinary matters would be left undone. The end result would be either a school system unable to suitably run its schools or the hasty appointment of a perhaps unsuitable replacement.
This is not to say that boards should be allowed to operate shorthanded indefinitely. The legislature has mandated that such boards should have five members and has provided a mechanism for filling vacancies. However, school boards must be given a reasonable amount of time in which to find a suitable candidate. Furthermore, unless a school board is so shorthanded as to be unable to effectively function, a school board with less than full membership must be able to conduct its normal day to day business until it again has five members. Of course, while a school board is so operating, the presence of three members will still be required for the purposes of constituting a quorum under § 37-6-9 and the agreement of three members will still be required for the conducting of business.
In the case at bar, the taxpayer/objectors claim that the only action that the shorthanded four person school board could take at the July 9, 1992, meeting was the selection of a new member; therefore, their approval of the results of the September 17, 1991, election and their issuance of the bonds were ineffective. However, when one considers that Robert Haynes had resigned only ten days before this meeting, it becomes apparent that a reasonable amount of time had not yet elapsed. To force the NPCSD board to either choose a new member within such a short amount of time or sit on their hands until they did so, would be to risk district-wide stagnation or the creation of an incompetent school board. This is a result that the creators of the statutes could not have intended. The shorthanded school board had the authority to approve the September 17 bond election and authorize the issuance of the bonds at the July 9, 1992, board meeting.

V. WHETHER THERE WERE DEFECTS IN THE CERTIFIED TRANSCRIPT SENT TO THE STATE’S BOND ATTORNEY THAT WERE SO SEVERE THAT THE BONDS SHOULD NOT BE ISSUED.

The procedure governing the validation of bond issues can be found at § 31-13-5. It reads in part:
' When any county, municipality, school district, road district, drainage district, levee district, sea wall district, or any other district or subdivision authorized to issue bonds shall take steps to issue bonds for any purpose whatever, the officer or officers of each county, municipality, or district charged by law with the custody of the records of same shall, if the board issuing same so determine by order en *1121 tered on its minutes, transmit to said bond attorney a certified copy of all legal papers pertaining to the issuance of said bonds, including transcripts of records and ordinances, proof of publication, and tabulation of vote, if any, and any other facts pertaining to said issuance....
Miss.Code Ann. § 31-13-5.
The taxpayer/objectors claim that the bond transcript sent by the board to the State’s Bond Attorney contained material and substantial defects that should preclude validation.
The first such error that they cite in their brief is that no notice of the July 31, 1991, special meeting was included in the transcript. Although this fact is true, it is not enough to force the nullification of the bonds. While § 31-13-5 does require the inclusion of “all legal papers pertaining to the issuance of said bonds,” invalidating the bonds because of the absence of a document which would have made a positive opinion by the Bond Attorney even more likely would be nonsensical. If he approved the issuance of the bonds without evidence of proper notification of the meeting, assuredly he would have approved issuance with the notification. This defect in the transcript was harmless.
The next error cited by the taxpayer/objectors concerns the transcript’s representation of the late signing of the minutes of the July 31, 1991, meeting. If one looks at the transcript it appeal’s that Haynes signed the minutes within the statutorily imposed 30-day limit when in fact he did not. Although this is somewhat misleading, it does not require the invalidation of the bonds. Although school boards should try to deliver to the State’s Bond Attorney as accurate a transcript as possible, even the most fastidious of preparers may make the occasional mistake.[9] These are still people “unlearned in technical requirements.” Martin, 178 So. at 320. To throw out an entire bond issue because of a purely technical inaccuracy would be too severe. The omission of the proper signing date was not an error that should force the invalidation of the bonds.
The next notable assignment of error concerns the representation of Haynes’ signature as president of the Board of Trustees on the minutes of a September 10, 1992, board meeting when in fact Haynes had resigned several months previously. However, it is unclear from looking at the undated signature page what the actual date of the “signature” was. Also, the vote to adjourn cited on that same page lists only Wallace, Mamón, Gordon, and Blakely as voting; Haynes’ name is absent. The preceding page, dated September 10, 1992, is subscribed by the actual signature of Otis Wallace, the true Board president on that day. The appearance of Haynes’ apparent signature on the undated page might have been a little confusing in light of all the other indications that Haynes was not then president. Nevertheless, the small amount of confusion caused by this misstatement is not enough to require the invalidation of the bonds. Again, while a best effort is expected of school boards when preparing bond transcripts, perfection is not required. This too is a harmless error.
The taxpayer/objectors also intended that the statement in the bond transcript certification that “there is no litigation pending or threatened in any way involving the issuance and sale of the Bonds” was untrue. They were correct. According to the parties’ stipulations of November 10, 1993, the case to force the issuance of the bonds which was filed on December 9, 1991, was still ongoing when the bond transcript was certified. However, according to the uncontroverted testimony of School District attorney Nancy Maddox, the substantive issues of the case had been settled at the time of certification, leaving only the issue of attorney’s fees remaining. Furthermore, this was a suit for and not against the issuance of the bonds. It is quite unlikely that the State Bond Attorney would have changed his pro-validation opinion to an anti-validation opinion had he known of this pro-validation lawsuit. Once *1122 again, there was an error and once again, it was harmless.
Somewhat more worrisome is the transcript certification’s denial of the threat of litigation'. A letter was sent by the Tunica law firm of Dulaney & Dulaney on behalf of “several citizens and taxpayers” to the NPCSD Board of Trustees on October 2, 1991, which discussed the possibility of a lawsuit if the bond issue was approved. Ac-knowledgement of this threat should have been included in the transcript. Nevertheless, while knowledge of this lawsuit may have caused some concern on the part of the State Bond Attorney, it cannot be said that this mere possibility of litigation would have caused the him to reach a different conclusion. This error is also not enough to force the invalidation of the bonds.
It should be kept in mind that although a review by the State Bond Attorney is a prerequisite to the validation of a bond, the approval of a chancellor is still required. Taxpayers are permitted to file objections • with the chancellor and bring out whatever facts they deem necessary before he makes his final decision. See Miss.Code Ann. § 31-13-5.
Although there were irregularities in the minutes and procedure of the July 31, 1991, meeting of the NPCSD Board of Trustees, they were not so severe as to require the nullification of the actions of the board at that meeting. In regards to the vote total, the non-voted ballots should not be counted towards the total number of votes. Because of this, the bond issue received the sixty percent needed to pass. Also, as the Board of Trustees was authorized to determine whether the bond passed, their determination that it did should be conclusive.
Furthermore, there were no changes in the location of the polling places which would require pre-clearance under the federal Voting Rights Act. Also, even though the board was shorthanded at its July 9, 1992, meeting, it was able to conduct business such as the approval of the bond issue.
Finally, although the transcript sent to the State Bond Attorney had several inaccuracies, they were not of sufficient severity or quantity to require the invalidation of the bonds.
In the final analysis this was an election approved by 60 percent of the participating voters of this school district, well over a majority.
It is the policy of the law to give effect and validity to elections of the people when there has been a reasonably fair attempt to comply with the requirements of the law, and no fraud has been practiced. Mere technical irregularities and omissions in the performance of ministerial duties by commissioners will not be permitted to defeat the popular will where there has been an attempt to conform to the law and no injury has resulted to any one. When the will of the electors has been fairly expressed, it should control.
State v. Greer, 158 Miss. 315, 130 So. 482, 484 (1930).
The opinion of the lower court is therefore affirmed.
AFFIRMED.
SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS JR. and SMITH, JJ., concur:
DAN M. LEE, P.J., and McRAE, J., concur in result only.
PRATHER, P.J., not participating.

APPENDIX A

IN THE CHANCERY COURT OF THE ' FIRST JUDICIAL DISTRICT OF PANOLA COUNTY, MISSISSIPPI
IN RE: VALIDATION OF $2,500,000 GENERAL OBLIGATION SCHOOL BONDS, SERIES 1992, NORTH PA-NOLA CONSOLIDATED SCHOOL DISTRICT, DATED
NO. S-92-10-258
OPINION
This is a proceeding to validate $2,500,000 general obligation bonds of the North Panola Consolidated School District. Objectors filed many written objections to the validation of said bonds.
*1123 Objectors argue that notice of “special meetings, were not properly recorded, rendering any action at these special meetings void.”
Section 25-41-13 of the Mississippi Open Meetings law requires that notices of special meetings are to be posted within one hour of a special meeting being called and that the notice be made a part of the minutes. Miss. Code Ann. Section 25-41-13 (1972). There is no penalty in the statute for not complying with this requirement. Section 25^41-15 of the Open Meetings Law provides for enforcement of that law by injunction or mandamus relief but does not add any other penalty.
Section 37-6-11 Miss.Code Ann. (1972) states: The school boards of all school districts shall meet regularly at such time and at such place as shall be designated by an order entered upon the minutes thereof. Special meetings of such boards shall be held upon the call of the president thereof, or upon the call of a majority of the members thereof.
The aforementioned Section 37-6-11 does not require for the notice of a special meeting to be placed in the minutes, and there is no penalty for the failure to do so.
The minutes of the July 31, 1991 School Board meeting recites “Numerous members of the public were also present.” The meeting was an open meeting and was not held in secret.
The court holds that the failure of the minutes of the July 31, 1991 meeting of the School Board to show notice of the special meeting did not void the bond election.
Objectors argue that the resolution adopted on July 31,1991, calling the September 17, 1991, special election was void because the Board did not have the full text of the resolution before it.
Mr. Randall Ward, board attorney, testified at the validation hearing that the Board used basically the same resolution hearing that it had used in calling the previous July 9, 1991 election. There were no major changes.
The court holds that the failure of the school Board to have the full text of the resolution before it when it adopted the resolution calling for a special election did not void the special election.
Objectors argue that the bond issue failed to pass by the legally required number of votes. Section 37-59-17 of the Miss.Code of 1972 requires three-fifths of the qualified electors who voted in such election voted in favor of the issue of such bonds, [sic] The election commission of Panola County showed 2407 votes for the bond issued [sic] and 1592 votes against the bond issue. The election did carry by a three-fifths majority of the qualified electors who voted in the election.
The objectors argue that the polling place in the West Como precinct was not the usual and customary polling place. The notice of the election showed the Como City Hall to be the polling place for the West Como precinct. The chairperson of the election commission and the Panola County Circuit Clerk testified that the Como City Hall was the usual and customary polling place for the West Como precinct.
The minutes of the Panola County Consolidated School District contained certain errors. However, the court holds that such errors were not sufficient to invalidate the actions of the school board.
Objectors argue that litigation relating to such bonds was pending on September 10, 1992, the date of certification of the legal papers submitted to the State Bond attorney. That the certificate made no mention of said litigation but represented that there was no litigation pending which vitiates the opinion of the State Bond Attorney. According to the stipulation of the parties, circuit court case No. 91-131-B(P1) in the Circuit Court of the First Judicial District of Panola County, Mississippi, was pending on September 30, 1992, the date the State Bond Attorney issued his opinion on the bonds. However, the suit sought to force the Board of Trustees to issue four million dollars in school bonds rather than trying to stop the issuance of the bonds. The parties had agreed to a settlement of the case and the only issue was attorney fees.
*1124 The court has carefully considered all of the written objections filed by the Objectors and does hereby find and hold the said objections are not sufficient to invalidate the bond election.
The court does hereby find and hold that the $2,500,000.00 General Obligation School Bonds, Series 1992, North Panola Consolidated School District, dated October 1, 1992, should be validated.
You may prepare a decree validating said bonds.
This the 3rd day of December, 1993.
/s/ W.E. Bearden, Jr. W.E. Bearden, Jr.
Special Chancellor

. Under Mississippi law a school bond issue must pass by a margin of 60 percent. Miss.Code Ann. § 37-59-17.

. In Como, the police station is part of the City Hall and the terms “police station” and "City Hall” are often used interchangeably in the record to describe this voting site.

. The actual bond issue ballot read:
PROPOSITION
Shall the North Panola Consolidated School District of Panola County, Mississippi, issue its general obligation bonds in the maximum principal amount of $4,000,000 to raise money for the purpose of erecting, repairing, equipping, remodeling, and enlarging school buildings and related facilities, and garages for transportation vehicles; purchasing transportation vehicles; establishing and equipping school athletic fields and necessary facilities connected therewith; and providing necessary water, light, heating, air conditioning and sewerage facilities for school building?
( ) FOR THE BOND ISSUE
( ) AGAINST THE BOND ISSUE

. Case No. 91-137-B(P.).

. On 27 ballots the voters did not vote either for or against the bond issue, and on 17 the voters voted both for and against the issue.

. No. S-92-10-258.

. See Appendix A.

. The meeting in question took place on July 31, 1991, the next regular meeting was on August 14, 1991, the minutes were approved at the August 21, 1991 meeting, and the run of 30 working days lasted until September 12, 1991. On October 11, 1991, Haynes signed the minutes of the July 31, 1991 meeting.

. It should be noted that no one has accused the School Board of attempting to intentionally mislead the State's Bond Attorney.